Jasen, J.
In June, 1973, the Superintendent of Insurance promulgated regulation 65 (11 NYCRR Part 202), which limits to specified maximum levels, adjusted for volume, the commissions an insurance agent may receive for life insurance policies issued on a mass-merchandising basis under plans sponsored by union-management employee welfare funds. The issue on this appeal is whether regulation 65 conflicts with positive provisions of the Insurance Law and is, therefore, a nullity. Or put more concretely, the issue is whether the *784 Superintendent of Insurance may adopt a regulation to control the masking of a group insurace arrangement, subject to close statutory and administrative regulations, under the guise of issuing individual policies by which a salesman of insurance in complicity with a union-management welfare fund may enhance his commissions.
Plaintiff Benjamin Ostrer is a duly licensed life insurance agent who is in the business of soliciting and placing life insurance coverage for members of union-management welfare funds. Ostrer had an agency relationship with the International Life Insurance Company of Buffalo. Under the terms of his agency agreement with the insurance carrier, Ostrer was to receive a commission on each individual life insurance policy he placed with the company equal to 55% of the first-year premium. The rate of commission applicable to the placement of a single policy covering a group of individuals was substantially lower.
In the spring of 1973, plaintiff successfully arranged for the placement with International Life of a life insurance program to be sponsored by the Airline, Aerospace and Affiliated Employees Severance Fund for Local 732. The assets of this union-management welfare fund were contributed pursuant to the terms of a collective bargaining agreement. Instead of providing for a single-group policy to cover all fund members, plaintiff arranged with the trustees of the fund for a program whereby each member would be issued a uniform individual policy with terms prearranged by the trustees of the fund and the insurance carrier. Ostrer was, thus, able to claim the benefits of the higher commission rate applicable to individual policies. Regulation 65, which took effect prior to payment of the commission to Ostrer, limits his commission to no more than 5.2% of the annual premium of each policy. (11 NYCRR 202.2.) Relying upon the duly promulgated regulation, the insurance carrier refused to pay Ostrer the full commission specified in the agency agreement.
Plaintiff brought an action to invalidate regulation 65. After a trial, Special Term found in favor of the plaintiff and held that regulation 65 conflicted with subdivision 4 of section 213 of the Insurance Law. The Appellate Division affirmed. We conclude that regulation 65 is a valid exercise of powers conferred upon the Superintendent of Insurance by statute, that the regulation does not conflict with any provision of the *785 Insurance Law, and that the order of the Appellate Division should be reversed.
Subdivision 4 of section 213 of the Insurance Law establishes, as a general principle, that the first-year commission on the sale of life insurance may be as great as 55% of the first-year premium. Plaintiff argues that regulation 65 reduces the maximum commission level below the rate established by statute and must, therefore, be invalidated. However, subdivision 11 of section 213 specifically excludes group insurance from the expense limitations provided elsewhere in the statute. Thus, the threshold question is whether it was reasonable for the Superintendent of Insurance to conclude that the mass-merchandising of identical policies to members of a defined group was, in reality, a form of group insurance. If the classification was reasonable, subdivision 4 of section 213 is no bar to the regulation.
Group life insurance is defined by statute to include a policy issued to the trustees of a fund established by two or more employers in the same industry or labor unions to insure employees of the employer or members of the unions. The basic requirements are that the persons eligible for insurance be employees or union members; that the premium be paid by the trustees from fund assets; that the policy include at least 25 persons on the date of issue; and that the amounts of insurance available under the policy be fixed. (Insurance Law, § 204, subd 1, par [d].) We conclude that the Superintendent of Insurance could reasonably exercise his broad regulatory powers to prevent a collusive arrangement between an insurance salesman and the trustees of a union-management welfare fund from masking a group insurance program through the mass issuance of standard individual policies, pursuant to a common plan to fund members.
The superintendent has wide authority to "prescribe, in writing, official regulations, not inconsistent with the provisions of this chapter * * * interpreting the provisions of this chapter”. (Insurance Law, § 21.) Further, the superintendent possesses whatever powers may be "reasonably implied” from the statute. (Insurance Law, § 10.) The courts have consistently recognized that these provisions vest the superintendent "with broad power to interpret, clarify, and implement the legislative policy”. (Breen v Cunard Lines S. S. Co., 33 NY2d 508, 511.) Provided that his regulations are not inconsistent^ with some specific statutory provision, the superintendent *786 may prescribe regulations "to effectuate any of the powers given to him by law” (Matter of B. & R. Excess Corp. v Thacher, 37 Misc 2d 307, 309, affd 18 AD2d 1137), including any powers that the statute reasonably implies.
The function of a reviewing court is a limited one. The challenger of a regulation must establish that the regulation "is so lacking in reason for its promulgation that it is essentially arbitrary.” (Matter of Marburg v Cole, 286 NY 202, 212.) The interpretation given a statute by the administering agency "if not irrational or unreasonable, should be upheld.” (Matter of Howard v Wyman, 28 NY2d 434, 438.) As was observed in Mississippi Val. Barge Co. v United States (292 US 282, 286-287), "[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.”
There is ample warrant in the record to support the conclusion of the superintendent that mass-merchandised, standard individual policies issued to members of a group are the functional equivalent of a single-group policy issued to the representatives of the group. Except for the fact that there is no single piece of paper specifying the terms of the group program with the word "policy” embellished upon it, mass-merchandised and standard policies, issued only to members of a given group, are, practically speaking, group policies. The only distinction is merely one of paper form and is of no real difference. Under the mass-merchandised plan, the individual group member has no bargaining power; he must accept or reject the terms as offered. The terms of the plan are not negotiated by the individual members of the group, but rather are negotiated solely by their representatives. Of course, the most critical feature is that these mass-merchandised policies are sold only to group members and not to the public at large. We believe that the superintendent could reasonably guard against a contrived evasion of the statutory restriction on insurance salesmen’s commissions in writing group insurance coverage under the guise of standard individual policies.
To resolve the case, we need take the analysis only one further step. Granted that mass-merchandised individual policies are group insurance and, thus, maximum commissions are not regulated by statute, it remains for us to consider whether the superintendent acted reasonably in limiting commissions ,, on such standardized policies to a maximum of 5.2% per annual premium. We believe that he did.
*787 The superintendent’s regulation affects only mass-merchandised policies issued pursuant to plans sponsored by union-management welfare funds. (11 NYCRR 202.2.) The record discloses that, coincident with the rapid post-World War II expansion of union welfare funds, some insurance companies began to follow unsound and unethical practices in connection with the solicitation and issuance, of group insurance contracts covering union welfare plans. During the early 1950’s, "the public [was] shocked by the dislcosure of excesses which have taken place in the management of the sums contributed by employers to union welfare funds for insurance and pension benefits of employees and their dependents.” (NY Legis Ann, 1956, pp 259, 260.) In 1956, the Legislature reacted to the crisis by vesting considerable authority in the Superintendent of Insurance to supervise operations of employee welfare funds. (L 1956, ch 774; see Governor’s Message of Approval, McKinney’s Session Laws of NY [1956], p 1687.) It became declared State policy "that employee welfare funds are of great benefit to employees and their families and that their growth should be encouraged; that the establishment and management of such funds vitally affect the well-being of. millions of people and are in the public interest; and that such funds should be supervised by the state to the extent necessary to protect the rights of employees and their families, without imposing burdens upon such funds which might discourage their orderly growth and without duplicating the supervisory responsibilities presently vested in any state agencies.” (Insurance Law, § 37.) Subsequently, the superintendent was granted broad authority to "from time to time promulgate appropriate supplementary rules and regulations designed to carry out the express provisions and purposes” of the statutes regulating employee welfare funds. (Insurance Law, § 37-n, subd 1.)
Upon investigation, the superintendent discovered instances where some employee-management welfare funds were induced to purchase individual policies for each employee, rather than a single policy covering all members of the relevant group. The consequence of this method of purchase, as nicely illustrated in the present case, was to permit insurance agents to collect the substantially higher commissions that result from the issuance of individual policies rather than one group policy. In light of the fact that only one true sales effort is involved, the superintendent found that commissions *788 for such "individual” policies were "unconscionably high”. Commissions and allowances amounted to as much as 90% of the first-year premium. Such rates constituted a clear violation of the Code of Ethical Practices adopted in 1957 by the National Association of. Insurance Commissioners (Code of Ethical Practices with Respect to the Insuring of the Benefits of Union or Union-Management Welfare and Pension Funds).
The record establishes that the incentive to earn the excessive commissions associated with individual policies also induced other abuses in the sale of insurance to union-management welfare funds. For example, the Insurance Department discovered that this plaintiff sold a series of individual policies in a situation where a single-group policy would have more appropriately satisfied the particular insurance needs of the welfare fund. Further, under some plans, individual policies would lapse when an employee, covered for only a few years, was laid off for a period in excess of three months. Upon the employee’s return to gainful employment, a new individual policy would be issued and another full commission paid. This was a hardship to the employee because he had aged in the interval, resulting in a diminution of coverage. One company reported instances where welfare fund trustees permitted a whole series of individual policies to be periodically transferred from one carrier to another in order to generate the large first-year premiums. In short, the potential for excessive commissions was a factor in the determination of the form of insurance purchases and the best interests of welfare fund members, was frequently overlooked or disregarded. Further, the practice of selling individual policies on a mass-merchandising basis had become so widespread that insurance companies developed programs with such practices specifically in mind.
In our view, regulation 65 is a reasonable exercise of the superintendent’s broad power to protect the beneficiaries of union-management welfare funds from abuses. Such funds, the Legislature has declared, are to be operated for the benefit of the members. Clearly, the payment of excessive premiums is not in the economic best interests of the membership. The superintendent could reasonably expect that, as a result of a prohibition against the payment of excessive commissions, welfare fund beneficiaries would receive better coverage and greater return for the same or less cost. The record reflects that, because of reduced commissions, at least one insurance *789 company has requested permission to increase the cash value of existing policies. In short, the superintendent had a rational basis for promulgating regulation 65.
In sum, we conclude that regulation 65 is not in conflict with any positive provision of the Insurance Law. Instead, we hold that the regulation is a permissible and reasonable exercise of the superintendent’s broad statutory authority to regulate fraudulent and collusive insurance practices so as to carry out the legislative policy to protect the beneficiaries of welfare funds. It is well within the proper province of the Superintendent of Insurance, the official responsible for the effective implementation of the Insurance Law, to regulate, control and suppress devised and contrived schemes targeted at the contravention or avoidance of the legislative policy. Indeed, it is most vital and paramount that the superintendent vigorously pursue and thwart disingenuous efforts to evade and detour the legislative design, especially where the Legislature has acted to protect a particular class from the consequences of fraud and overreaching.
Accordingly, the order of the Appellate Division should be reversed and judgment granted in favor of defendant declaring regulation 65 (11 NYCRR Part 202) valid.
Chief Judge Breitel and Judges Jones, Fuchsberg and Cooke concur; Judges Gabrielli and Wachtler taking no part.
Order reversed, with costs, and judgment granted in favor of defendant declaring regulation 65 valid.